Before we proceed, I wanted to take a moment to thank Judge Baker for assisting us today. Judge Baker is joining us from the International Court of Trade and we really appreciate his assistance in sitting by designation and helping us out with our docket. Thank you so much, Judge Baker. Thank you. We have three arguments that have been submitted on the briefs and that those cases are Frank Kwatomek-Luna v. Kudeo Kijizaki, Zhu Rong Zhang v. Merrick Garland, and Kevin Salas-Suarez v. Merrick Garland. So our first case set for oral argument is National Lifeline Association v. Marybel Batjer. And so if you, counsel, if you're ready to proceed, you may do so. Good morning, Your Honors, and may it please the Court, my name is Ina Inagrata for the California Public Utilities Commission. I would like to reserve three minutes for rebuttal. I intend to first address... How many minutes did you say? I'm sorry, I didn't hear that. Three. Okay. I intend to first address the Court's question on mootness. Second, I would like to turn to the merits and discuss the reasons why the state subsidy rule should not be preempted by the Federal Communications Act. In short, the three reasons are, at its court, the state subsidy rule does not do what the Federal Communications Act prohibits. It controls state spending, not wireless rates. Second, it aligns with the dual purposes of the Federal Communications Act. It does not prohibit wireless carriers from setting their own rates on the open market or create barriers to competition. Rather, it advances universal service as Congress directed. Finally, the rule does precisely what Congress has directed states to do. It assures universal service rates are just, reasonable, and affordable. I would like to return to these points in more detail. Turning now to mootness and the language of the District Court's injunction at 1 ER7. The District Court's order prohibits the state from enforcing the free rate rule as defined in the complaint and set forth in Decision 2010-006. First, to avoid confusion between the free rate rule and the state subsidy rule, they refer to the same minimum service standards established in Decision 2010-006 that determine whether a plan is eligible for a universal service subsidy. The decision never used the term free rate rule. As the Court correctly pointed out, the decision and the rule it contained, however named, has expired by its own terms. Therefore, the District Court injunction bars the state from enforcing a rule that no longer exists. There is no longer a live controversy between the parties and the case is moot. When an appealed injunction expires by its terms, the appeal generally becomes moot. The appellate court lacks jurisdiction and must dismiss the appeal. In general, if federal courts normally... Can I ask you a question then, Counsel? So, do you agree that the 2020 rate rule implicates Section 332C3A of the Communications Act? No, Your Honor. I don't agree that it implicates Section 332C3A. At all? At all, because it is better understood within the context of Section 254 and the universal service regulation that Congress has authorized states to do. And what's your best authority for that? It is both in terms of looking at the text of Section 332 and the intent of Congress. And in terms of the Supremacy Clause analysis, the intent of Congress is the ultimate touchstone, and that is Chief Loan v. Legit Group. And so, if you would like me to turn to... Before I turn to the merits, I would like to say one final thing about mootness, and that we ask this court to follow established practice if the case becomes moot on appeal, to dismiss the appeal as moot, vacate the judgment, and remand with direction to dismiss the complaint. And the Commissioner respectfully asks that the court do so here. Now turning to the merits. I'm sorry, you had not argued mootness. Are you arguing mootness now? I know that we asked you to talk about mootness, but are you saying the case is moot or not? Yes, Your Honor. Because the district court injunction prohibits the state from enforcing a rule that no longer exists. There is no longer a live case or in controversy, and so the case is moot. Yes, Your Honor. So in response to your question, we do argue mootness. Was the rule renewed? Like, what happened? So there's nothing on this record that tells us what happened. As I understand it, this is renewed every year or implemented every year. So the Universal Service Program has been active in the state of California for the last 30 years. And so year to year, the Commission staff does make minor adjustments to the program. However, it only makes major decision and policy changes as necessary. So year to year, the staff may issue an advisory letter saying we amend the minimum service standards as such, and so making small modifications. But big policy changes take place at larger intervals. For example, the last major decision on universal service before the challenge 2020 decision was the 2014 decision that allowed wireless carriers to participate in universal service. So it's not inherently tied to a one-year schedule that would evade review. So we asked the question, says this, I'm quoting from the record now, this decision establishes specific support amount and minimum service standard tiers for a one-year period. And before December 1st, 2021, we must revisit these issues to establish tiers for the following year. So my question is, what do they do for the following year? For the following year, the Commission established new service tiers and new conditions, but there is no longer the zero dollar copy conditions are not, there's no such rule. Well, was that because, was it suspended because of the injunction from the District Court or did they, did you all decide that we're out of this business, we don't want to, we're not going to do this anymore? Like, was this a change in policy or was this in response to the District Court's decision? Well, first in response to the District Court decision, we implemented the injunction and honored it, but when that expired, the Commission did not issue a new, it did not reissue the rule. Is that, does that reflect, the Chief? No, I'm sorry to interrupt. I just wanted to ask if you intend or, you know, to implement a different rule now that the rule has expired. Sorry to interrupt. Well, the Commission did implement a different rule. That's, that's not now before this Court. I know, but what would stop you from adopting a similar rule? Well, there's nothing that, that would, because the injunction has expired, there's, or rather the decision that defined the prohibited action has expired, there's nothing necessarily that would prevent the CPUC from adopting a similar rule in the future, but there's also been no indication that the CPUC will adopt a similar rule or that it would evade review if it so did. Have you all made a policy decision not to resume this conduct in the future? Has that, has that been, is that the considered decision of the Commission that can you represent to us that we're not going to do this again or is it you're reserving your rights to reinstitute this policy? The Commission only speaks through its decisions, so I can't speak for what the Commission will do in the future. All I can say is that the latest California Lifeline decision has not reenacted this, these zero dollar copay conditions. So it wasn't merely suspended during dependency of the injunction, it was actually not renewed? Yes, Your Honor, it was actually not renewed. And you can't firmly represent to us that it's not going to happen again? Well, the, there are five Commissioners at the Commission who made, make decisions for the Commission and it's purely speculative whether the, the wireless carriers will even apply for California Lifeline in the future or whether their business plans will change or how subsidies between the federal governments and the states, how those will be different in the future. So at this point, it's speculative what may play out in the future. I, I cannot represent that the California Public Utilities Commission would never again contemplate a zero dollar copay, but there's no indication at this point that. Did, did they give any statement when they adopted the policy that is effective for the end of 2021? Was there any policy statement by the Commission to the effect that, you know, we, we did this, but we're not, we're not, any indication whatsoever, any tea leaves that we can look to? I'm sorry, Your Honor, I, I'm not aware of that information. If I may ask you, yes, Your Honor. Can I ask you, it seems like your argument is that CPU is acting under the authority of Section 254, you mentioned that. I think it's 254I, is that right? 254F and I, yes, Your Honor. Okay. And so where, I'm just trying to find, where in the provision does it say that states can cap wireless rates? So Section 254F allows the states to establish their own conditions for universal service. And in Section 254I, Congress has charged the states with ensuring that rates of universal service are just reasonable and affordable. And even if we were to read this in conjunction with and if the state cannot directly set the rates for universal service, a conditional subsidy is not direct rate regulation. So, but, but I know you, because you point to 254F, but it seems like 254F outlines the power of states under the past regulations that advance universal service goals so long as they do not conflict with the FCC's authority. And that's where I'm getting a little hung up with respect to your argument, because it seems like, because of the broad language of the Telecommunications Act, this would conflict with the FCC's authority. So if you could address that for me, I'd appreciate it. Yes, Your Honor. There is no FCC decision that I have been able to find or that Plaintiff Appellee points to that determines that subsidy, that subsidy conditions are what Congress intended to prohibit in Section 332C3A. I see that I'm almost out of time. The reason for that is that they don't prohibit, they don't prohibit wireless carriers for setting their own rates on the open market. And promoting open market competition was what Congress intended in Section 332. Section 254F is a different subsection of the market, and it has different conditions. I don't know if Americans has access to telecommunications service at affordable rates. I would like to reserve the rest of my time for it. I want to reserve some time, but I have a couple of questions I really wanted to be able to ask you. I'm trying to figure out how should we view CPUC's previous decisions that state that the CPUC cannot cap wireless rates? The CPUC has previously taken that interpretation. However, the CPUC is not asking for deference here. It is not the agency charged with interpreting the Federal Communications Act, and even the U.S. Supreme Court reverses itself. And the California Public Utilities Commission has the authority to change its decisions under PE Code Section 1708 if it gives notice and opportunity to comment. So yes, the commissioner has at one point taken that interpretation and has since determined that it was not the best way to interpret the act, and that rate regulation authority is not required to regulate the terms and conditions of universal service. I had just one other question. Has California petitioned the FCC for rate making authority under 332? It has in the mid-90s, but it has not done so since that. Okay. Thank you. Chief, can I ask a couple of questions? I'm sorry. Of course, of course. Thank you. Two quick questions. One, under the federal lifeline service, can the federal government can do so and may choose to exercise that authority or not? Have they ever done that? I am not sure, Your Honor. I don't believe so. And then I think you briefly mentioned LAV in the Seventh Circuit case, and I thought it was an interesting dichotomy. It seems to say, looking at Gould and Boston Harbor, that if on one end the state is acting like a market participant, then it's not a regulation. But on the other end, if it's more towards a regulator, then you are preempted. And so why are you on the market participant side with this type of regulation? Because what the state is saying here is they would like to, for the California lifeline program, the state would like to purchase a minimum level of service, and for that they're willing to offer a particular payment. And no wireless carrier has to offer that. And the state is not required to purchase for this program, in essence, a less valuable plan. Sorry, Chief, one more question. I apologize. Under the federal system, how does the subsidy work? If the federal government is just giving them money, how are they ensuring that they're going to offer a low cost plan to lower income customers? I'm sorry, Your Honor, I can't speak for how the federal government does that. Okay, because it seems like they're just giving them a subsidy and then just hoping the companies lower their prices. Yes, and I think the FCC can take that policy position. No further questions. I'll give you a couple minutes for rebuttal. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. John Heitman, appearing today on behalf of National Lifeline Association, or NALA for short. I'd like to start, if I could, by responding to some of the questions that Judge Momotai asked, and in particular about market participation and being a market regulator. I'm sorry to interrupt you, but can you actually start with mootness? We may not even need to be here, so tell me why this case isn't moot. I'd be happy to start with mootness, Your Honor. And on that point, I would submit to you respectfully that this case is one that is capable of repetition, yet evading review. And I say that because what we have here is a rule that has a one-year time period. It's not enough time for us to have a district court opine on that rule and then have this court. And so clearly, one year isn't long enough to get through the process, so it's certainly capable of repetition and evading review. And as the Commission's decision and review indicates, the Commission intends to revisit these rules annually. And it did so. It did so in September of this last year, and there were some questions about that order. In September of last year, in Decision 2109.23, the Commission decided, the Commissioners decided not to reimpose a zero-dollar copay rate on the basic and standard wireless lifeline plans because of the district court's order. At page 22 of that order, the Commissioners state, quote, consistent with the district court's order, this decision does not set a zero-dollar copay requirement for a wireless plan to be state subsidy eligible. So that order suggests to me that they would have done so, but for the district court's order. And, Your Honors, I would respectfully ask that the court take judicial notice of that decision. It is my intention to file a 28-J letter submitting that decision to the court this afternoon. All right. Well, that's going to be very helpful, but so I have another question that is related to this. Where on this record can you show me anything regarding the intentions of your members regarding to provide service under this program? All I have is a complaint. Yes. With allegations that have been denied, and we're in a 12-C posture, which means that we can't accept any of the allegations that have been denied. We have no declarations. We have no affidavits. I don't know what the posture of your members were at the time that you filed this complaint. Okay. Your Honor. Did you all decide, did you decide not to participate, or did you decide to participate at a loss, or did your members lose interest? I just don't know. The members that provide California Lifeline have a designation called Eligible Telecommunications Carry Designation. The PUC has designated the wireless providers to provide Lifeline. Once they get that designation, they are required to provide Lifeline. In fact, they are required to provide the basic and standard plans, and they have done so at a zero dollar copay. And they have done so because in order to charge a copay above zero dollars, they have to file something called an advice letter with the Public Utility Commission. Okay. Well, is any of this, what if, what if this is in the record showing that your, your members actually intend, what in this record shows that your members, you have no declarations, you have no affidavits. I can't tell what your members did once the, once the Commission made the challenge decision. I don't know what you all did. Your Honor, one thing I can point you to is on page 20 of our brief, and at the Commission's brief, I don't have the page site off the top of my head, but it refers to these advice letters, which were filed by the members and then denied by the Commission. Yes. And so that is in the record. Those advice letters are in the record where it shows that two of our members filed for permission to provide the basic and standard lifeline plans at a rate above zero dollars. The Commission then denied those. I recognize that, but then what, what happened after that? I mean, do you have, typically in litigation, when you file a complaint seeking declaratory injunctive relief, you say, this is the injury that happened to me. This is how it's going, and particularly when you're seeking injunctive relief, you show how it's going to be continuing injury. Did your clients have to participate or could they have No, they have to participate, Your Honor. As I mentioned, they have what's called ETC, Eligible Telecommunications Carrier Authority, that compels them to participate in the program, and not only do they have to participate in the program, the California Commission requires them to offer at least either the basic or the standard wireless plan, and so they do that, and they have been doing that, and they have done that at zero dollars because notwithstanding the Court's decision, the California Commission has not approved an advice letter that would allow them to charge anything but zero dollars for that plan. Is any of that in the record? The denial of the advice letters is in the record, Your Honor. But that's all, so, but other than that, okay. You're charging the zero copay now, is that what you just said? Yes, the carriers continue to charge a zero dollar copay, and Your Honor, there are other federal subsidies that have come into place, and the federal subsidies available to low-income consumers across the country have increased in part because of emergency relief that happened with COVID, so consumers are eligible for a larger discount. I do want to address the issue of, continue addressing the issue of mootness, because I do think it's an issue, obviously, that we can't get through in a year, and based on the decision, the Commission would have imposed a zero dollar rate, in my view. I think it's fairly obvious from that decision, but for the District Court's order, and if the Commission, excuse me, if this Court does not think that this case is subject to that exception to the mootness doctrine, then I would submit to you that the District Court's order should stand, and that it should not be vacated. First, the District Court's order should stand because it's correctly decided. All right, Section 332 clearly sets a barrier around wireless rate regulation, and it says quite plainly that the states may not regulate any wireless service, any wireless service plan, and what you have here, and it says what the commissions can do, the states can do, the states can regulate terms and conditions other than rates, and this is not a term and condition other than a rate. It's a zero dollar rate. It's quite obvious it's a zero dollar rate for those two plans. So, under the Lavin dichotomy, which I think is a helpful way to look at this case, you know, the market participant versus a regulator, why isn't that California's assessment correct, that they're just purchasing plans for lower income folks, and if you want to supply it, you have to charge zero copay? Your Honor, the California Commission adopted these two rules, a zero dollar for tier one, zero dollar for tier two, in the context of a rate regulation proceeding, a rulemaking proceeding. It's acting as a regulator. It does not purchase these plans. Well, that's what Lavin was concerned about. It's not the Right. Well, Your Honor, Lifeline works in this way. The carriers are a conduit for the subsidy to get passed through to the consumer, and the subsidy is passed through to the consumer in the form of a discount on their phone and internet service. Those consumers buy these plans from the carriers one by one. The state does not buy plans in bulk, and so the state is not buying any plans. One by one, these consumers buy these plans. The carriers provide that discount, and the carriers then seek reimbursement for the discount in the month after that. What guarantees that that discount is passed through to the customer, at least on the federal side? Auditing. There's a rule. You have to demonstrate that you've passed that discount through to the customer, and you can only claim amount of subsidy equal to the discount. So there is about nine and a quarter of federal subsidy and about $14 in change of California subsidy. We round it to $24. If your plan is subsidy, if your plan is, say, $25. Has the federal government ever required a copay? Zero copay? No, Your Honor. The federal government does not require a copay. It does not regulate wireless rates. Okay. Do you think they have the authority to ask for that copay, a zero copay? I do not know, Your Honor, whether the federal government can regulate wireless rates. Wireless is subject to very light regulation at the federal level, and at state level, Section 332 makes clear, it's not subject to any rate or entry regulation. States can make regulations on terms and conditions other than rates. I want to turn back to this question of whether or not you're required to participate. Are you telling me that, and this is contrary to what I understood going into this, that you're telling me that in order to just provide garden variety wireless service in California, the state requires you to participate in this program? No, Your Honor. The state does not require a participation lifeline program. You have to apply to get a designation called ETC designation, but once the carriers apply to get that designation, they are compelled to provide lifeline service. It's not optional. What do you mean compelled? Wait a minute. Compelled? Can they withdraw? Can they just say, we don't want to do this anymore because we're losing money? Your Honor, they can withdraw from offering service plans and lifeline plans in particular in the state of California, but that is exactly the opposite of what 332 says should be happening, right? 332 is intended to make... Wait a minute. What does that mean? Wait a minute. Just give me a yes or no answer. Can they withdraw if they're not making... If you decide that this is just not working for us, we're not going to participate, yes or no? The carriers would have to petition the California Commission to withdraw from the lifeline program. They would have to get the Commission's approval to withdraw from the lifeline program. Why would the Commission say no? I mean, so what does... Your Honor, but that would... Yes, the carriers could do that, but there's this federal statute, which is section 214, which requires the states to eligible telecommunications carriers. Section 214 determines the states shall designate. It is the intention of the federal government that the states designate providers to participate in these lifeline plans. The federal lifeline plan and the state lifeline plan should a state have one, and California does have one. And so that is the lifeline program, but what you have here is a rate regulation where one is not allowed. There is no exception. Counsel, if your providers are participating in California's lifeline program but refuse to charge a zero copay, what can the California Commission do? The California Commission can enforce against that carrier. Yeah, in what way? They can require them to comply with California rules. But what if they don't? They could then remove their designation and ability to participate in that particular program. And then what would the penalty be that they don't get the subsidy? The penalty is that they are not allowed to participate in the California marketplace, which is directly opposite of what section 332 says. Section 332 does not have a carve-out for universal service programs. Section 332 doesn't say... Wait, that's an important point. So you're carriers don't participate according to the rules of lifeline, then California can kick your carrier out of the state of California? Out of serving that marketplace. I mean, what marketplace? The lifeline marketplace or regular market, the garden variety marketplace? It's a low-income marketplace, Your Honor. In order to compete effectively in this low-income marketplace... But you're saying you're going to be kicked out of this program. Excuse me? You're going to be kicked out of a lifeline program if you don't go along with a copay. Right. Now, we'd say that California cannot kick us out of the federal lifeline program. What it can do in a state's program is different. But the idea of voluntariness, Your Honor, is if the commission could set a rate for any wireless plan, low-income or not, lifeline or not, right? And the carriers can walk away and say, I don't want to do that, right? Right. But that is exactly the opposite of what 332 says. In those cases... But you can walk away and offer your own plan to lower-income folks, right? And just charge zero copay. We could offer our own plan. Voluntarily, you could just take the federal subsidy and give zero copay to California low-income customers. But we cannot compete. And what the California Commission is doing by creating this rate regulation, it is impacting the wireless marketplace in the way that the federal government and Congress said it should. Well, yes. You can't compete in the same footing as those that participate because they get a bigger subsidy. Right. And there's a reason why 332... But the point is that you can compete just at a disadvantage because you don't get the subsidy. Yes. And I think the purpose of 332 was the states would not be skewing the competitive marketplace by imposing entry regulation or rate regulation on wireless service providers. And this idea that it's voluntary, if the state's argument that it's voluntary prevails, then this state could set a rate for every wireless plan. Why? Because every wireless provider's participation in the California marketplace for every wireless plan is voluntary. There's no regulatory compulsion for wireless providers to serve the customers in the state of California. Why do they? Because Section 332 has opened the door. And by eliminating barriers to entry and by eliminating barriers that distort the competitive marketplace, and that is rate regulation. But you're not compelled... I just... You're not compelled to participate in the Lifeline program. Your members are. Excuse me, Your Honor? You're not compelled to participate in the... But we're entitled to participate. 254... That's a different question. You may be entitled, but you're not compelled to. Right. But we have a right, Your Honor. We have a right to be free of wireless rate regulation, and that is set by 332. Well, that's a separate question, but this is the question of whether or not you're compelled to participate in this program, and you're not compelled to participate in this program. But we have a right to participate in the program. Section 214 of the Act says the state shall designate eligible telecommunications carriers. That's the word, shall. It's not optional. We have the right to participate. And so the answer that we can walk away if we don't like the rules because they violate 332, I don't think is the appropriate answer. I think... Are there carriers that don't participate in Lifeline? Are there carriers that don't participate? Yes. In California? There are carriers that don't participate in Lifeline. So it's a choice? Yes. There are carriers that don't participate in Lifeline, but there are carriers that do participate in Lifeline. And once they participate in Lifeline, they have no choice but to serve California Lifeline subscribers. They have no choice but to offer the basic and standard plans. And so when the Commission sets a rate of zero, that rate setting runs afoul of Section 332. 332 does not contain an exception for voluntariness. It doesn't contain an exception for consumer protection, no exception for universal service programs, no exception for conditional grants. If the Commission needs to regulate wireless rates, there is a clear and simple path in Section 332. 332 says that they can petition the Federal Communications Commission for that authority to regulate rates. Under 254I, if they think that the rates are not just and reasonable and affordable, the answer is that they have tools. They can allow more people into the program as they did in 2014 when they let more wireless providers into the program. They can adjust the subsidy level as they did last year. They raised it. They can adjust the minimum service standards. They have those tools. The one tool they don't have is rate regulation. In order to get wireless rate regulation tool, they have to go through the Federal Communications Commission because that is the construct set up in 332. Can I ask you a question? Because it seems like the law is framed as a consumer protection measure. And you're saying that even as a consumer protection measure, state law can't effectively regulate wireless rates without being preempted by federal law? What's your best authority for that? Your Honor, my best authority is Section 332. It prevents state wireless rate regulation. It doesn't include a carve-out for consumer protection. And, you know, I think everything the Commission generally does can be considered consumer protection, right? That's one of the mandates of the Commission. So if there was a carve-out to 332, it would essentially gut the entire preemption. And so if the Commission wants to regulate wireless rates because it thinks there's been a failure in the market, right? It thinks the rates are not affordable, not just, or not reasonable, which is not a finding of the Commission made in the decision under review. But if it were to make that finding, the path is simple. It goes under Section 332. It petitions the Federal Communications Commission for that authority. And then they would have that authority if they met that burden. They didn't do that here. They didn't take the path that the federal government, in fact, the Congress set forth in Section 332. Instead, they tried to carve an exception out of the statute that no court and no agency, not the Federal Communications Commission or any other agency, including the California Commission, twice before got it right. They have not recognized this exception. In 2016 and only a few months before this decision in 2020, the Commission got it exactly right. 332 prevents the Commission from setting wireless rates, including wireless lifeline rates. Is CPUC precluded from using its public funds to reach certain statutory objectives? No, Your Honor, the PUC is not precluded. These funds, by the way, are funds that are universal service funds, right? This is not the state coffers. These funds are collected and contributed to the state by the providers. And the providers generally, in turn, collect the funds from consumers through surcharges. But it is not a case where wireless providers are the government's coffers. It's a system at the federal level and the state level where a universal service assessment is charged on revenues that the providers have, interstate or intrastate revenues. And the carriers participate, and the carriers are compelled to fund these state and federal universal service programs. Now, again, most carriers pass through these charges, these contributions in the form of surcharges to consumers. But we're not talking about appropriated money out of the California Treasury. What we're talking about is universal service funds. Thank you. Judge Bumate, Judge Baker, do you have any further questions? No, thank you. Okay. Thank you very much. And counsel, I'll give you three minutes. We took you a little over and we took your opposing counsel a little over, so I'll give you three minutes. Thank you, Your Honor. Plaintiff appellate conflates the federal and the state universal service programs when it states that wireless carriers are required to participate in the lifeline service. Section 214E is what controls the ETC designation. That is a designation that relates to the federal universal service program. This case is about the California lifeline program. Nothing about being designated as a federal California lifeline provider requires NALA's members to participate in California lifeline. So let me ask you this question that I posed to your friend. So once their advice letter was denied, what were the options of the members, right? So they put in a request to charge the federal universal service program. Once their advice letter was denied, could they have just walked at that point? Yes. And the commission's 2014 decision makes that clear that for wireless carriers, participation in California lifeline is voluntary. And so all they need to do is submit a 30-day notice by letter that they're leaving the program. There's no compulsion to continue to participate in the program. So their options are offer whatever services they wish on the open market. And like Judge Bumate said, they could offer the federal California lifeline, collect that subsidy, and voluntarily have a $0 copay without taking or whichever copay they want without taking state funds. That that is economically disadvantageous does not mean the state is violating their rights. Do they have an absolute right to? Excuse me, Chief. Chief, go ahead. So they have a right to participate and be regulated by the state. Is that what you're arguing? Your Honor, no, they do not have a right to participate in California lifeline. This is a, the state has discretion about eligibility conditions, about what sorts of wireless plans meet the goals of providing affordable universal service to Californians. And so there's two different types of authority that Congress gives the state to designate, to designate carrier eligibility. Section 254F governs state universal service programs. Section 214E governs the federal universal service program, which is not an issue here. So the fact that the carriers are—Counsel, before your time runs out, can you answer if a what can the commission do to that provider? Very, very little. At that point, they just won't receive the subsidy. They're not a, they won't have their authority taken away to participate in the broad California lifeline markets. There's no, there's no penalties. And so all that would happen is they wouldn't be a participating provider because they don't have an eligible plan that's approved. So they just wouldn't get the subsidy? Yes. So they just wouldn't be able to participate. But if they had wanted to withdraw and that you got these letters and they said, no, we don't like this. So we want to withdraw. Would that have been granted? Is that a withdraw as a matter of right? Or is there any discretion on the part of the, is this a Hotel California program, which you check in, you can't leave? They can withdraw as a right. They are not carriers of last resort. So that is not these wireless carriers designation. And so only carriers of last resort have to petition for authority to withdraw. Wireless carriers providers can elect to leave with a 30-day notice. Thank you, your honors. Thank you very much. Appreciate council both representing both lifeline and the commissioners of the California public utilities for their argument presentations. The case of National Lifeline Association versus Marybel Batcher is now submitted.
judges: MURGUIA, BUMATAY, Baker